I, Maximilian Fox, being duly sworn, hereby depose and say:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), Boston Division, assigned to the Worcester Resident Agency. I have been employed by FBI for approximately five years as a Special Agent and have been assigned to the FBI Joint Terrorism Task Force ("JTTF") for the last year.

2. I have probable cause to believe that contraband and evidence of a crime, fruits of a crime, and instrumentalities of violations of 18 U.S.C. § 844(i), malicious destruction of property; 18 U.S.C § 247(a), destruction of religious property; and 18 U.S.C. §922, felon or other prohibited person in possession of a firearm or ammunition, are located within ▮▮▮▮▮▮ Holliston, Massachusetts (hereinafter the "SUBJECT PREMISES").

3. I submit this application and affidavit in support of a search warrant authorizing a search of the SUBJECT PREMISES, as further described in Attachments A and B, incorporated herein by reference. Located within the SUBJECT PREMISES to be searched, I seek to seize evidence, fruits, and instrumentalities of the foregoing criminal violations. I request authority to search the entire SUBJECT PREMISES, including the residential dwelling and any computer and computer media located therein where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as contraband and instrumentalities, fruits, and evidence of crime.

4. The statements contained in this affidavit are based in part on, among other things, information provided by FBI Special Agents; criminal histories; court records; witness interviews; and information received from agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). Because this affidavit is submitted for the limited purpose of securing authorization for the requested search warrant, I have not included

each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish the necessary foundation for the requested warrant.

5. Title 18, United States Code Section 844(i) provides, "[w]hoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years…"

6. Title 18, United States Code Section 247(a) provides that, "[w]hoever, [in or affecting interstate or foreign commerce] --(1) intentionally defaces, damages, or destroys any religious real property, because of the religious character of that property, or attempts to do so… shall be punished…"

7. Title 18, Section 922(g) provides, "It shall be unlawful for any person—(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;…[or] (8) who is subject to a court order that-- (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate; (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury; or (9) who has

been convicted in any court of a misdemeanor crime of domestic violence, to… possess in or affecting commerce, any firearm or ammunition … which has been shipped or transported in interstate or foreign commerce."

## BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

8. On July 27, 2016, day the Federal Bureau of Investigation ("FBI") received a tip on www.fbi.gov from one WT-1 WT-1 ("WT-1 ▬▬▬ of Joseph Garguilo ("Garguilo") The tip stated, in sum and substance, that WT-1 was worried about ▬▬▬ Garguilo, because he had recently acquired parts to make an AR-15, and also that he was stockpiling food water and other weapons, to include tasers, mace guns, hunting knives and thermite. The tip also reported that Garguilo had stated that "he will plant bombs in police stations… and kill as many homeland security officers as he can before they kill him."

9. According to the report, Garguilo googles how to make bombs and how to kill a person the quickest along with what are of the body makes a person bleed the fastest. WT-1 reported Garguilo to be unstable and unpredictable and further that Garguilo hates gays, minorities, and the police. WT-1 reported that Garguilo was a drug user who is actively using again and that she was in fear for her life and for the public.

10. As result of this tip, agents met and interviewed WT-1 WT-1 on July 28, 2016. During that interview she reported to agents, in sum and substance that, her two children ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ used to visit their father Joseph Garguilo.

11. According to WT-1 both ▬▬▬ and ▬▬ have witnessed ▬▬▬ stockpiling tasers, mace guns, food and water. Further, Garguilo believes that the structure of America will collapse and that America is going to enter a state of martial

3

law. According to [WT-1] Garguilo has demonstrated the use of tasers to both children and has deployed them against inanimate objects and on himself.

12. Garguilo has told [redacted] that he has purchased "thermite" and he hopes to build thermite grenades which he will use to kill police officers when martial law is declared. He also told [redacted] that he purchased ammunition, magazines and parts to make an AR-15 but had not yet assembled them.

13. The tip reported that Garguilo resided at the SUBJECT PREMISES.

14. As a result of this interview, on July 29, 2016, agents contacted the Holliston Police Department and spoke to detectives there. Detectives are familiar with Garguilo and noted that they believed that Garguilo had been involved in some kind of hit and run incident. Detectives reported that Garguilo had metal bars on his doors and windows, wears a handcuff key on his neck, and is reputed to abuse prescription medication. Detectives reported that they were further aware that Garguilo and [WT-1] are going through a contested [redacted] dispute.

15. On August 25, 2016, [WT-1] [WT-1] called agents to report that [WT-2] [WT-2] ("[WT-2] of [redacted] Massachusetts, called [WT-1] to say that [WT-2] had recently been to Garguilo's home and in the basement. There, [WT-2] saw a partially assembled AR-15, crossbow and knives. In that same meeting, Garguilo reportedly told [WT-2] that he wants to attack a mosque and/or kill President Obama. [WT-2] also told [WT-1] that [WT-2] was concerned that Garguilo was using steroids.

16. Today, August 26, 2015, agents spoke to [WT-2] on multiple occasions. During those conversations, [WT-2] explained that [WT-2] worked in emergency medical services and that

4

      WT-2 was a veteran, who served fifteen years in the Army ▓▓▓▓▓▓▓▓▓. WT-2 is a childhood friend of both WT-1 and Garguilo.

17. WT-2 told agents that, in mid-August of 2016, WT-2 had visited Garguilo to check in on Garguilo because WT-2 had noticed that Garguilo's mental state had gone downhill. During the visit, WT-2 accompanied Garguilo to the basement of Garguilo's home.

18. In the basement, WT-2 saw a partially assembled AR-15 rifle, held in place by a vice. WT-2 who is familiar with the weapon from his Army service, reported, in sum and substance, that the weapon had a barrel and gas tube, a bolt, a receiver, firing pin, two lower receivers, and a butt stock. WT-2 was unsure of the sights were present, or, whether the trigger assembly was present.[1] According to WT-2 the upper receiver was complete and the firing pin and bolt were in place. The lower receiver was complete except for possibly the trigger assembly. In addition, WT-2 observed a light that could be mounted on the gun, a "k grip" that could be mounted, as well as "rails" by which flashlights and other items can be attached to the weapon. WT-2 further reported that Garguilo had two lower receivers.[2]

---

[1] Title 18, United States Code, Section 921 provides: "The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon;..." 18 U.S.C. §921(a)(3).

[2] I am informed by ATF that the AR-15 is manufactured by Colt outside the Commonwealth. I am further informed, however, that there are variants of the AR-15 which are similar in physical appearance, some of which may be manufactured in the Commonwealth of Massachusetts. The vast majority of AR-15 variants, however, are produced outside the Commonwealth of Massachusetts.

19. [WT-2] explained that Garguilo has an unspecified quantity of thermite,[3] a few body armor vests, a Kevlar helmet, brass knuckles, and several knives.

20. During the visit, Garguilo told [WT-2] that he bought the thermite and the parts for the AR-15 online. [WT-2] did not notice any ammunition present in the home.

21. In addition, during their conversation, Garguilo told [WT-2] that he plans to, "chain a mosque closed and burn it down." "Burn every motherfucker down in there."

22. Garguilo did not, however, mention any specific time of place for this attack.[4]

23. According to [WT-2] Garguilo has been talking about building an AR-15 for several months, however, [WT-2] had not believed that Garguilo was serious. Garguilo also recently asked [WT-2] for help getting magazines for an AR-15 and a handgun, but [WT-2] refused to help.

24. [WT-2] also reported that during the visit, Garguilo made a comment to the effect that when President Obama was on the golf course in Martha' Vineyard, Garguilo should have taken the opportunity to kill him.[5]

---

[3]Thermite is a term of art for a combination of chemicals that creates a high-temperature fire that can cut through metal objects.

[4] [WT-2] also told agents that he believes Garguilo is using steroids because Garguilos' muscle mass appears to have dramatically increased in the past few weeks and he appears unusually angry.

[5] Garguilo also made threats, albeit indirect, at [WT-2] because [WT-2] refused to testify against [WT-1] for a court hearing scheduled for August 29, 2016. It is not certain that this is the "hearing" to which Garguilo referred, however, according to the records of the Wrentham District Court, counsel for Garguilo has filed a motion to reconsider the issuance of the restraining order against Garguilo which counsel has requested be marked for hearing on August 29, 2016.

25. ▉WT-2▉ told agents that it is his belief that if law enforcement shows up with a warrant Garguilo will fight them. ▉WT-2▉ also stated, "Honest to god. I think he's gonna' snap," referring to Garguilo.

### Garguilo's Criminal History and Outstanding Restraining Order

26. Agents have run Garguilo's Massachusetts criminal history. Garguilo's address is listed as the SUBJECT PREMISES. The criminal history report lists a number of "sealed adult appearances,"[6] including: a ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ conviction ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ for which a sentence ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ was imposed.

27. A charge of ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ under Massachusetts law, G.L. c. ▉▉▉▉▉, carries a potential penalty in excess of one year.

28. The exact status of that conviction is presently unclear. The fact that it is sealed is unusual, however, nothing else in the criminal history suggests that the conviction was vacated or overturned. Efforts were made to discover more information concerning the conviction, however, the Clerk's Office of the ▉▉▉▉▉▉ District Court declined to provide any sealed record absent a court order.

29. In addition to the above noted conviction, Garguilo is the subject of an active restraining Order issued under M.G.L. c. 209A, by the Wrentham District Court (Docket #1657RO132) that is in effect until July of 2017 and which has been in effect since June 1, 2016.

---

[6] The Criminal History reports: "Sealed records are available to criminal justice agencies as defined in M.G.L. c 6, §167 for official criminal justice purposes and as otherwise authorized by law. In addition, sealed records may include CORI and Juvenile criminal history otherwise regulated under M.G.L. c. 6, §172 and M.G.L. c. 119, §60A."

30. Massachusetts General Laws Chapter 209A allows for the entry of restraining orders to "[a] person suffering from abuse from an adult or minor family or household member..." G.L. c 209A, §3.

31. The records of the Wrentham District Court reveal that a temporary restraining order issued on or about June 1, 2016, and that on or about June 10, 2016 and on or about June 20, 2016, Garguilo requested continuances of those proceedings so that counsel could appear on his behalf.

32. On or about July 20, 2016, the defendant appeared. On that date, after hearing at which both WT-1 and Garguilo were present, the restraining order was extended to July 20, 2017.[7]

33. The restraining order provides that Garguilo resides at the SUBJECT PREMISES.

34. The Order prohibits, among other things, Garguilo from possessing firearms based upon a finding that "there is a substantial likelihood of immediate danger of abuse..." and the Order further directs that Garguilo is Ordered not to abuse the Plaintiff, by harming, threatening, or attempting to harm the Plaintiff physically...."

35. Garguilo has no FID card and no Massachusetts license to carry.

36. Based upon the foregoing, I have probable cause to believe that Garguilo has violated 18 U.S.C. § 844(i), 18 U.S.C § 247(a), and 18 U.S.C. §922 and that evidence of those offenses would be located at the SUBJECT PREMISES.

## Computers

37. Garguilo told WT-2 that he had ordered parts for the AR-15 and thermite online.

---

[7] There appears to be a pending motion to reconsider in which Garguilo alleges that he did not have sufficient opportunity to address the Court in prior hearings.

38. Accordingly, I believe that Garguilo utilized a computer, or other similar device capable of accessing the internet in furtherance of above noted crimes.

39. Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following two reasons:

   a. Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data that is available in order to determine whether it is included in the warrant that authorizes the search. This sorting process can take days or weeks, depending on the volume of data stored, and is generally difficult to accomplish on-site.

   b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure that is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed,

password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

40. In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit ("CPU"). In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media).

41. Furthermore, because there is probable cause to believe that the computer and its storage devices are all instrumentalities of crimes they should all be seized as such.

## SEARCH METHODOLOGY TO BE EMPLOYED REGARDING ELECTRONIC DATA

42. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

    a. on-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence, and a scan for encryption software;

    b. on-site forensic imaging of any computers that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for examination; such imaging may require several hours to complete and require law

enforcement agents to secure the search scene until that imaging can be completed;

c. examination of all of the data contained in such computer hardware, computer software, or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

d. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

e. surveying various file directories and the individual files they contain;

f. opening files in order to determine their contents;

g. scanning storage areas;

h. performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and

i. performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

43. I am further aware that computers often contain what is termed user attribution information, that is, information not directly involved in a crime, but which identifies the user of the computer, both generally and at the times that materials subject to search and

seizure were created, accessed, or used. This warrant further seeks to seize any and all relevant user attribution information.

## Conclusion

44. Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are located at the SUBJECT PREMISES, described in Attachment A. I respectfully request that this Court issue a search warrant for the SUBJECT PREMISES, authorizing the seizure and search of the items described in Attachment B.

_____
Special Agent Maximilian Fox
Federal Bureau of Investigation


Sworn and subscribed to before me this 26th day of August, 2016.

_____
TIMOTHY S. HILLMAN
United States District Judge